FILED
United States Court of Appeals
Tenth Circuit

September 8, 2025

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

THOMAS LAMARE BROWN,

Defendant - Appellant.

No. 25-6004
(D.C. No. 5:23-CR-00272-PRW-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HARTZ**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

_____

After pulling Thomas Lamare Brown over for a traffic violation, law-enforcement officers searched his car and found several firearms. A federal jury later found him guilty of possessing a firearm as a convicted felon. In this appeal, Mr. Brown argues that the district court should have suppressed the evidence found in his car. We disagree, so we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.  The Traffic Stop & Subsequent Search[1]

Oklahoma Highway Patrol Trooper Tanner Eads pulled Mr. Brown over on an interstate highway just after midnight for using his fog lights when "no fog or similar atmospheric condition" existed.  R. vol. 1 at 89.  Trooper Eads told Mr. Brown why he had stopped him, and Mr. Brown "expressed some confusion about the location of his fog lights."  *Id.*  Trooper Eads asked Mr. Brown to get out of his car so that he could show him where the fog lights were located.  During this exchange, Trooper Eads noticed a large knife in the cupholder of Mr. Brown's car.

With Mr. Brown out of the car, Trooper Eads pointed out the fog lights and then asked Mr. Brown to accompany him to the patrol car so that he "could write him a warning."  *Id.* at 90.  Mr. Brown agreed.  Once they reached the patrol car, Trooper Eads asked Mr. Brown if he could pat him down for weapons.  Mr. Brown said the request made him uncomfortable.  Trooper Eads offered a compromise, asking Mr. Brown to lift up his shirt.  When Mr. Brown complied, Trooper Eads saw what he thought was the clip of a pistol holster on his waistband.  Trooper Eads told Mr. Brown to get on the ground and asked him what was attached to his waistband.  Mr. Brown disobeyed the commands to get on the ground and claimed the clip held his eyeglasses.

Mr. Brown began walking toward the back of the patrol car and then took off running across the highway.  Trooper Eads did not give chase.  But Mr. Brown soon

---

[1] We take these facts (aside from the image on the following page) from the district court's suppression order.  Neither party challenges these factual findings.

reappeared, running back across the highway toward his car. He ignored commands to stop and got into his car before ultimately surrendering.

Mr. Brown's car sat "mere inches from the right-hand lane of the interstate highway." *Id.* at 91. It was so close to the fog line that when Mr. Brown got out of the car, "he stepped out into the traffic lane." *Id.* This image shows the car's proximity to the fog line:



R. vol. 5.[2] Trooper Eads decided to impound the car. While waiting for a tow truck to arrive, law-enforcement officers searched the car, finding two pistols, two rifles, and ammunition.

## II. District Court Proceedings

Mr. Brown moved to suppress the evidence found in his car. Although he conceded that there was a valid reason to pull him over, he argued that Trooper Eads violated his Fourth Amendment rights by asking him to exit his car and then accompany him to the patrol car, by impounding his car, and by searching it. The

---

[2] This image was taken from the video of the stop captured by Trooper Eads's dashboard camera.

district court denied the motion.  A jury found Mr. Brown guilty of possessing a firearm as a convicted felon, and he received a sentence of 188 months in prison under the Armed Career Criminal Act.

## III.  Discussion

The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. Const. amend. IV.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment."  *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024) (internal quotation marks omitted).

### A.  Duration of the Traffic Stop

A traffic stop is a seizure under the Fourth Amendment.  *Id.*  To be reasonable, a "traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself."  *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (internal quotation marks omitted).  Authority to seize a driver "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  And so a traffic stop becomes unreasonable if an officer (1) departs from the traffic stop's mission to investigate a crime, (2) in a way that prolongs the stop, (3) without independent reasonable suspicion supporting the investigative detour.  *See Baker*, 108 F.4th at 1248.

4

Mr. Brown contends that Trooper Eads unlawfully prolonged the traffic stop twice—first by asking him to exit his car and then again by asking him to go to the patrol car.

Trooper Eads did not depart from the traffic stop's mission by asking Mr. Brown to get out of his car to view his fog lights. The reason for the stop was Mr. Brown's improper use of the lights. And after Mr. Brown expressed confusion about the fog lights, it was reasonable for Trooper Eads to show him where they were located. Perhaps Mr. Brown is right that the action was not "necessary," Aplt. Br. at 23, and that it exposed him to dangerous passing traffic. Or perhaps, as Mr. Brown suggests, it would have been more effective to show him how to turn the fog lights on and off inside the car. But those issues are beside the point. After all, "the Fourth Amendment does not require officers to use the least intrusive or most efficient means conceivable to effectuate a traffic stop." *United States v. Mayville*, 955 F.3d 825, 832 (10th Cir. 2020). And we must assess the seizure's reasonableness based on what Trooper Eads actually did, "not what another hypothetical officer could or should have done." *Baker*, 108 F.4th at 1250.

Nor did Trooper Eads unreasonably prolong the stop by asking Mr. Brown to accompany him to the patrol car. The district court found that the request "did nothing to extend the duration of the stop." R. vol. 1 at 94. That was a factual finding. *See United States v. Malone*, 10 F.4th 1120, 1124 (10th Cir. 2021). And

5

Mr. Brown cites no evidence suggesting the finding was clearly erroneous.[3] He notes that Trooper Eads already had his driver's license and expressed an intent to write him a warning. But why would having Mr. Brown go with him to the patrol car add any time to Trooper Eads's task of writing a warning? Mr. Brown doesn't say.

### B. Impounding the Car

A vehicle impoundment is a seizure and so typically requires a warrant. *United States v. Ulibarri*, --- F.4th ----, 2025 WL 2371551 at *3 (10th Cir. 2025). But an exception to the warrant requirement exists for seizures carried out under police officers' community-caretaking functions. *United States v. Venezia*, 995 F.3d 1170, 1175 (10th Cir. 2021). Those community-caretaking functions include impoundments. *Ulibarri*, 2025 WL 2371551 at * 3. "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). Still, the government bears the burden to show that any community-caretaking impoundment has a reasonable (and not pretextual) justification. *Ulibarri*, 2025 WL 2371551 at *3.

---

[3] Even if this finding were clearly erroneous, we still would not reverse because the request for Mr. Brown to go with Trooper Eads to the patrol car did not divert from the traffic stop's mission. An officer's mission during a traffic stop includes both addressing the reason for the stop and also attending "to related safety concerns." *Rodriguez*, 575 U.S. at 354. Mindful of the dangers facing officers during traffic stops, we have recognized that they "can routinely remove occupants from the vehicle to ensure officer safety." *Baker*, 108 F.4th at 1247. That principle controls here. The Fourth Amendment permitted Trooper Eads to ask Mr. Brown to accompany him to the patrol car so that he could complete the traffic stop safely.

*Opperman* resolves this issue. Parked "just inches from the shoulder line of a heavily trafficked interstate highway late at night," R. vol. 1 at 95, Mr. Brown's car impeded traffic and threatened public safety and convenience. Resisting this conclusion, Mr. Brown contends that his car would not have impeded traffic because, although it was close to the fog line, it was not actually in a traffic lane. This argument fails to appreciate "the breadth of what is encompassed by 'efficient movement of vehicular traffic,' 'impeding traffic,' and 'public safety and convenience.'" *United States v. Trujillo*, 993 F.3d 859, 865 (10th Cir. 2021) (quoting *Opperman*, 428 U.S. at 369). As the district court recognized, if Mr. Brown's car had remained on the shoulder, it "may have caused motorists in the right-hand lane to have to reduce speed or change lanes, and worse yet, it may have caused a collision." R. vol. 1 at 95.

Yet Mr. Brown asserts that any traffic and safety concerns were just a pretext for the impoundment, Trooper Eads's real motive being a desire to look for evidence of a crime. This assertion "lacks a factual foundation." *Trujillo*, 993 F.3d at 870. The district court never found that Trooper Eads decided to impound the car even in part to investigate its contents, let alone that he acted for the sole purpose of investigation (as would be required to show a Fourth Amendment violation), *see id.* at 871; *Ulibarri*, 2025 WL 2371551 at *4 (recognizing that "mixed-motive impoundments do not run afoul of the Constitution").

Mr. Brown's remaining impoundment arguments target an inapplicable standard. Our circuit employs five nonexclusive factors to evaluate the propriety of

7

community-caretaking impoundments of vehicles that neither impede traffic nor compromise public safety. *See United States v. Sanders*, 796 F.3d 1241, 1248, 1250 (10th Cir. 2015). Mr. Brown focuses on these factors. But they do not apply in cases like this one where the impounded vehicle impeded traffic or threatened public safety. *See Ulibarri*, 2025 WL 2371551 at *5 n.4. And so we need not consider Mr. Brown's arguments addressing the *Sanders* factors (including his argument that an alternative to impoundment existed).[4] *See id.*

### C. Searching the Car

In district court, the government argued that, once law-enforcement officers decided to impound Mr. Brown's car, they had authority to search it for two independent reasons. First, the government said, the officers could conduct an inventory search "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Kendall*, 14 F.4th 1116, 1124 (10th Cir. 2021) (internal quotation marks omitted). Second, the government argued, the officers had authority to search the car as part of their community-caretaking function "to protect the public from vandals who might find a firearm or contraband drugs in an impounded vehicle." *Id.* at 1125 (ellipses and internal quotation marks omitted).

The district court concluded that the officers conducted a valid community-caretaking search because they had a reasonable belief that there was a gun in

---

[4] Even if we considered Mr. Brown's argument that his brother could have retrieved the car, the outcome would not change. *See Trujillo*, 993 F.3d at 870 (holding that sheriff's deputies were not required to allow a driver to call someone in the middle of the night to pick up a car impeding traffic before impounding it).

the car.  And it declined to determine whether the inventory-search exception to the warrant requirement also justified the search.

On appeal, Mr. Brown addresses only the inventory-search exception, disregarding the district court's conclusion that the search of his car "was permissible as a community-caretaking search."  R. vol. 1 at 97.  Because Mr. Brown makes no argument against the district court's rationale, he has waived any challenge to its ruling that the search satisfied the Fourth Amendment.  *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

## IV.  Disposition

The district court's judgment is affirmed.

Entered for the Court

Gregory A. Phillips
Circuit Judge